# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-0098V

|  |  |
|---|---|
| JACOB HAWKINS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: May 6, 2025 |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Ryan Pohlman Miller, U.S. Department of Justice, Washington, DC,* for Respondent.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

  On January 25, 2023, Jacob Hawkins filed a Petition under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he received a tetanus vaccine in his left shoulder on February 27, 2021, and subsequently suffered a shoulder injury related to vaccine administration ("SIRVA"), a defined Table injury. Petition at Preamble and ¶ 1.

---

[1] Because this fact ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I hereby find preponderant evidence supports a finding of the alleged vaccination occurring, despite the lack of a contemporaneous administration record, and of shoulder pain onset within 48 hours thereafter – although whether the claim is compensable as a Table SIRVA requires further fact development.

## I.  Procedural History

The Petition was accompanied by many of the medical records required by the Vaccine Act, and Mr. Hawkins's declaration sworn under penalty of perjury.[3] Exs. 1 – 9, ECF No. 1; Ex. 10, ECF No. 9. After OSM's Pre-Assignment Review ("PAR") identified the absence of a record confirming the alleged vaccination, he served an authorized subpoena onto the relevant provider, ECF Nos. 10 – 11. Petitioner filed more records; photos and text messages; and sworn declarations. Exs. 11 – 15, ECF No. 12.

On June 9, 2023, the records were deemed to be substantially complete, and the case was assigned to the "Special Processing Unit" ("SPU" – the Office of Special Masters' adjudicatory system for resolution of cases deemed likely to settle). ECF No. 14. Respondent determined that the case was not appropriate for compensation, ECF No. 20, and filed a corresponding Rule 4(c) Report on January 24, 2024, ECF No. 21. Respondent specifically argued that Petitioner had not preponderantly established the alleged vaccination or a Table onset. *Id.* at 10 – 14.

Over the next several months, Petitioner filed insurance statements; timestamps of the previously-filed photos and text messages; emails to a work colleague; and outstanding medical records. Exs. 16 – 18, ECF No. 23; Exs. 19 – 21, ECF No. 25; Ex. 22, ECF No. 29; Exs. 23 – 24, ECF No. 31; Supplemental Statement of Completion, ECF No. 33. The parties were also permitted, *see* ECF No. 22, to brief entitlement of all issues bearing on entitlement for a Table SIRVA. Petitioner's Motion for a Ruling on the Record filed Sept. 16, 2024, ECF No. 32 (hereinafter "Brief"); Response filed Oct. 30, 2024, ECF No. 34. Of note, Respondent newly argued that Petitioner had not ruled out potential other explanations or causes for his alleged SIRVA, Response at 10, and Petitioner did not file a permitted Reply. The matter is ripe for adjudication.

## II.  Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis,

---

[3] *See* 28 U.S.C.A. § 1746 (providing that such a declaration may be afforded like force and effect as a notarized affidavit).

2

conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> *Shoulder injury related to vaccine administration (SIRVA).* SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## III. Evidence

I have reviewed the whole record, including all medical records, affidavits, and additional evidence, and both parties' briefing to date. I highlight the following:

### A. Medical Records

- At the time in question, Mr. Hawkins (then 42 years old) had no history of left shoulder pain or dysfunction or any other relevant conditions, and no documented past receipt of a tetanus vaccine. *See generally* Exs. 1, 2, 7.

- On February 27, 2021, at an urgent care facility, Petitioner reported that he had sustained a right thumb abrasion while cleaning out a wood stove with steel flashing. Ex. 11 at 2. The record disclaims any further review of Petitioner's history – including any allergies, immunizations ("never reviewed… none"), medical/surgical/family history; or smoking/alcohol/drug use. *Id.* at 3 – 4. Vitals were not taken. *Id.* at 5. A nurse practitioner ("NP") recorded "appl[ying pressure x 15 minutes to right thumb; once it was clear, it was evident that that was more of an abrasion; steri-strips and steri-dressing placed." *Id.* The NP did not record any final diagnosis; orders; or further treatment plan. *Id.*[4]

---

[4] In April 2022, the urgent care facility provided four pages of records of the February 27, 2021 encounter, which were filed as Ex. 5. Afterwards in July 2022, the urgent care facility's operations manager wrote that it "does not have any radiology report and vaccination record for [Petitioner.] Medical records have already been faxed." Ex. 10 at 2. In April 2023, in response to a Court-authorized subpoena (*see* ECF Nos. 10 - 11) the urgent care facility provided a more complete ten (10) pages of records from the February 27, 2021 encounter (now including the "never reviewed" allergy, immunization, and history sections), which were filed as Ex. 11. Petitioner also filed insurance statements as Exs. 16 – 18 and 24, but they do not reflect any billing for the February 27, 2021 urgent care encounter.

- Five days later (March 4, 2021), Petitioner had an emergency room visit, and he now reported left shoulder/arm pain and reduced range of motion ("ROM") "ever since taking tetanus shot on the left arm 5 days ago." Ex. 2 at 263. A physical examination documented tenderness to palpation; range of motion ("ROM") was not documented. *Id.* at 264. The emergency physician's differential diagnosis included tendinitis, bursitis, and rotator cuff tear. *Id.* at 265. Petitioner was prescribed meloxicam upon discharge. *Id.*

- On March 8, 2021, Petitioner underwent acupuncture for issues including "left shoulder pain and stiffness – 1 week." Ex. 22 at 8.

- On that same date, Petitioner established care with a new primary care physician ("PCP") chiefly for an evaluation of left shoulder pain. Ex. 3 at 14. The PCP recorded: "[Petitioner] was seen at the ED on 3/4/21 for left arm pain… He was working on a pellet stove a week prior to onset of symptoms and sustained a cut on his right thumb which needed suture and a tetanus shot which he got on the left arm. Since the tetanus shot was given around end of February, he has since noted pain on his left arm… Admits that a few days prior, he was also pushing his nephew on a swing and was not sure if this has contributed to his pain. Denies fall, injury or trauma to the area." *Id.* An exam found tenderness and limited ROM. *Id.* at 15. The PCP tentatively assessed rotator cuff tendinitis, for which Petitioner would continue taking meloxicam and attend PT. *Id.*

- At his March 9, 2021 PT initial evaluation, Petitioner reported: "Cut thumb on 2/27/21 – went to urgent care. Got a tetanus shot in left arm. Next morning couldn't move his arm." Ex. 2 at 23. On exam, the shoulder had limited passive ROM. *Id.*

- Petitioner attended further PT sessions on March 19, March 22, and April 9, 2021, but without clear improvement. Ex. 2 at 17 – 25. At the April 9th session, the therapist recorded that "ROM has been highly variable and inconsistent without progress towards gaining full mobility despite repeat attempts and modalities," warranting imaging and an orthopedics evaluation. *Id.* at 24 – 25. (After Petitioner did not return to formal PT, an administrative discharge was entered on June 8, 2021. *Id.* at 20.)

- On April 17, 2021, an MRI of the left shoulder suggested: "1. No rotator cuff tendon tear, retraction or muscle atrophy. Mild infraspinatus tendinosis without tendon tear. 2. Diffuse capsular thickening with increased signal suggestive of capsulitis. Mild increased signal seen at the superior chondral labral junction likely represents synovitis although small paralabral cyst remains in the differential. Long head of

6

- biceps/superior labrum anchor is intact. 3. Mild hypertrophic changes at the AC joint. No subacromial or subdeltoid bursal effusion. 4. Small non-specific focus of T2 signal in the posterior superior aspect of humeral head without fracture likely representing reactive marrow changes." Ex. 3 at 31.

- At an April 22, 2021 initial evaluation with an orthopedics physician's assistant ("PA"), Petitioner recounted that his "[left shoulder] symptoms began approximately 2 months ago after a tetanus shot. Within 24 hours he began to experience stiffness and pain with range of motion. This progressed over approximately 3 to 4 days when he was evaluated…" Ex. 3 at 8. An exam found pain, reduced ROM, and positive impingement signs. *Id.* at 9. The orthopedics PA independently reviewed the MRI images, and his comments include the following: "Appearance of a SLAP tear, which the radiologist reads as a cyst, possibly due to the visibility of any communication to the joint." *Id.* The PA's formal assessment was non-specific left shoulder pain and impingement, for which he administered a subacromial steroid injection and recommended ongoing home exercises (previously provided by the physical therapist). *Id.*

- On May 18, 2021, Petitioner was experiencing ongoing pain ("deep and achy, localized to the shoulder without radiation"), despite some relief from the steroid injection. Ex. 3 at 17. On exam, the left shoulder still had mildly reduced ROM and positive impingement signs. *Id.* at 18. The orthopedics PA commented, upon further review of the MRI imaging: "Fluid surrounding the biceps, but no significant biceps tendinosis noted. Fluid noted below the biceps-labral attachment, raising questions about a possible SLAP tear." *Id.* The PA placed a new order for PT. *Id.*

- At his June 10, 2021 PT reevaluation, Petitioner reported that his left shoulder had an intermittent ache, mild stiffness, pain rated 1/10, and some difficulty fully reaching overhead and back. Ex. 6 at 71. The therapist assessed that his left shoulder's ROM was "impaired"; various movements were either "full" or close to full, but painful. *Id.* His strength was 4+ - 5/5. *Id.* The PT diagnosis was "mild… capsulitis." *Id.* at 70. Further PT sessions on June 25, July 13, and July 27, 2021 documented some improvement. *Id.* at 65 – 70.

- By a July 28, 2021 orthopedics follow-up, Petitioner reported improvement, but continued "pain with extremes of motion… deep within the joint." Ex. 3 at 23. An exam found normal ROM and strength, a mildly positive Neers sign, and positive crank test. *Id.* at 24. The PA wrote that the clinical picture remained "suggestive of an underlying labral pathology," and planned to see Petitioner again in three months. *Id.*

7

- At a final PT session on August 20, 2021, Petitioner's left shoulder displayed "very slow improvement." Ex. 6 at 69. An exam found "full pain-free" ROM and strength of 4+ - 5/5. *Id.* at 69 – 70. Petitioner was discharged to continue with a home exercise program, and workout precautions. *Id.* at 69.

- At a final orthopedics appointment on October 27, 2021, Petitioner denied any pain at rest or with functional activities, only pain with stretching and exercise. Ex. 3 at 21. The pain was localized to the bicipital groove. *Id.* The PA rendered a final assessment of non-specific left shoulder pain, which was improved and thus required no further interventions at that time. *Id.* at 22. There are no further records of an ongoing shoulder injury.

**B. Other Evidence**

- In a 2023 sworn statement, Petitioner maintained that he received a tetanus vaccine in his left shoulder during the February 27, 2021 urgent care encounter, and developed left shoulder pain within 48 hours thereafter. Ex. 9 at ¶¶ 2, 3. He recalls telling the PCP on April 8, 2021 that: "The only active thing I did after the injury was go to the park with my family for my mom's birthday. I had pushed my 4-year-old nephew on the swing, but I couldn't even use my injured arm because it was in so much pain. I also had it in a sling at the time." *Id.* at ¶ 5.

- Petitioner's wife recounts that on February 27, 2021, she drove him for medical attention of his injured thumb. Ex. 14 at ¶ 2. They were "shocked" by issues with hygiene, infrastructure, and staffing at the urgent care facility. *Id.* at ¶¶ 3 – 5. The wife recalls that the male urgent care provider[5] was unprofessional and conducted the examination without gloves; she "took photos of this in case [Petitioner] developed infections or issues with his injury later on." Ex. 14 at ¶ 4; *accord* Ex. 19 (timestamped photos of the encounter). That male provider then advised that a nurse would be in to administer a tetanus vaccine. Ex. 14 at ¶ 5. A few minutes later, an older woman entered the room and administered the shot in Petitioner's non-injured left arm, without confirming his identity or providing any information about the vaccination. *Id.* The wife confirms that Petitioner began experiencing severe pain by that evening, and ROM limitations by the next day. *Id.* at ¶ 6.

---

[5] Petitioner's wife incorrectly states that this urgent care provider was a physician. Ex. 14 at ¶¶ 4 – 5; *but see* Ex. 11 at 2 – 5 (reflecting that the urgent care provider was a nurse practitioner).

- Petitioner has also filed his messages describing a shoulder injury from the February 2021 tetanus vaccination, sent to different individuals on April 16, April 21, and December 27, 2021. Exs. 13, 20, 21.

## IV. Findings of Fact and Conclusions of Law

### A. Proof of Vaccination

As a threshold matter, any successful Vaccine Act claim must include preponderant proof of "recei[pt of] a vaccine set forth in the Vaccine Injury Table." Section 11(c)(1)(A). Additionally, when alleging a Table SIRVA injury as in this case, a petitioner must show he received the vaccine intramuscularly in his injured upper arm/shoulder. 42 C.F.R. § 100.3(c)(10)

When presented with preponderant evidence – such as consistent references in contemporaneously created medical records and/or credible witness testimony - special masters have found sufficient proof of vaccination even in cases lacking a written contemporaneous record memorializing the event.[6] However, evidence has found to be insufficient in cases involving inconsistencies related to Petitioner's vaccination status and the events surrounding vaccination.[7]

Here, the records reflect that on February 27, 2021, Petitioner received urgent medical attention for a wound sustained while cleaning out a wood stove. Ex. 11 at 2. Starting just five days later, other medical providers recorded Petitioner's history that the urgent care encounter had included a left-sided tetanus vaccination. *See, e.g.*, Ex. 2 at 23, 263; Ex. 3 at 8, 14. These reports from Petitioner began very close in time to the events in question, and they warrant weight as information offered to facilitate medical diagnosis and treatment. *Cucuras,* 993 F.2d 1525, 1528. Receipt of such a vaccine seems to have been appropriate in light of the reason for the urgent care encounter,[8] and

---

[6] *See, e.g.*, *Hinton v. Sec'y of Health & Hum. Servs.,* No. 16-1140V, 2018 WL 3991001, at *10-11 (Fed. Cl. Spec. Mstr. Mar. 9, 2018), *mot. for rev. den'd*, 2023 WL 3815047 (Fed. Cl. 2023), *aff'd*, 2025 WL 763153 (Fed. Cir. 2025); *Gambo v. Sec'y of Health & Hum. Servs.,* No. 13-0691V, 2014 WL 7739572, at *3-4 (Fed. Cl. Spec. Mstr. Dec. 18, 2014); *Lamberti v. Sec'y of Health & Hum. Servs.,* No. 99-0507V, 2007 WL 1772058, at *7 (Fed. Cl. Spec. Mstr. May 31, 2007).

[7] *See, e.g.*, *Matthews v. Sec'y of Health & Hum. Servs.,* No. 19-0414V, 2021 WL 4190265, at *6-7, 9 (Fed. Cl. Spec. Mstr. Aug. 19, 2021) *aff'd* 157 Fed. Cl. 777 (2021) (petitioner's reliance primarily on later notations of an allergic reaction).

[8] Centers for Disease Control and Prevention, *Clinical Guidance for Wound Management to Prevent Tetanus*, https://www.cdc.gov/tetanus/hcp/clinical-guidance/index.html (last accessed May 6, 2025)

9

Petitioner's past immunization history was either unknown or never reviewed, *see* Ex. 11 at 3. Petitioner's wife also recounts that the urgent care facility's conditions and quality of care were substandard (as corroborated by the timestamped photographs of a provider touching Petitioner's injured hand without gloves). Overall, the circumstances described provide compelling support for the conclusion that a left-sided tetanus vaccine was administered, even if it was not formally documented. Respondent does not dispute that tetanus vaccines are often administered intramuscularly, or that intramuscular administration would be less likely in this case.

I therefore find that Petitioner has provided preponderant evidence establishing that he received a tetanus vaccine intramuscularly in his left arm on February 27, 2021, as alleged.

### B. Onset

A Table SIRVA also requires proof of onset of new shoulder pain within 48 hours after vaccination. 42 C.F.R. §§ 100.3(a)(I)(C), (c)(10)(ii). Here, a March 8, 2021 medical record suggests that the tetanus vaccine was administered "a week prior to onset of [left shoulder] symptoms." Response at 9, citing Ex. 3 at 14. But that record was from just nine days after the vaccination. *Id.* Petitioner had already been to the emergency room for his new shoulder pain, and at that time (only five days post-vaccination) reported a very close if not immediate onset. Ex. 2 at 263. Numerous other records support onset as occurring within 48 hours post-vaccination. *See, e.g.*, Ex. 2 at 23; Ex. 3 at 8; Ex. 22 at 8.

Respondent also notes that the same March 8, 2021 record provides that "a few days prior, [Petitioner] was also pushing his nephew on a swing and was not sure if this has contributed to his pain." Response at 9, citing Ex. 3 at 14. The "few days prior" notation is nonspecific, and could be intended to describe the "swing" incident as being a few days prior to the March 8, 2021 medical encounter. Petitioner has endorsed that proposed sequence of events, and moreover recalls that he was *unable* to use his already-injured left arm to push the swing. Ex. 9 at ¶ 5. Thus, the overall weight of the evidence supports a finding that Petitioner's left shoulder pain began within 48 hours after the February 27, 2021 vaccination.

---

(providing that even a minor wound may warrant tetanus vaccination, depending on the patient's vaccine history).

**Conclusion and Scheduling Order**

As explained above, preponderant evidence supports some important components of a possible SIRVA claim. But there also is a potential alternative explanation for Petitioner's injury that might defeat his showing under 42 C.F.R. § 100.3(c)(10)(iv). Response at 10; *see also* Ex. 3 at 9 (orthopedics PA's opinion that the MRI images showed "appearance of a SLAP tear"), *id.* at 18 (MRI images showed "fluid… below the biceps-labral attachment, raising questions about a possible SLAP tear"), *id.* at 24 (clinical picture remained "suggestive of an underlying labral pathology"). While Petitioner's treatment course was rather limited and did not include any confirmation of a SLAP tear (e.g., during surgical intervention), there was certainly *suspicion* of such pathology – which would not be consistent with a SIRVA if it better explains Petitioner's symptoms.[9]

Respondent should have raised this argument earlier. *See generally* Rule 4(c) Report (disputing only proof of vaccination, and onset); *but see* Vaccine Rule 4(c) (stating that the report must "se[t] forth a full and complete statement of [Respondent's] position" including his "medical analysis… and… any legal arguments that Respondent may have in opposition to the petition"). But when the objection was raised, *Petitioner* should have availed himself of the opportunity to file a Reply. *See* Brief at 14 – 15 (arguing generally that his injury was "entirely consistent with SIRVA" and the records are "devoid of evidence" that might defeat the fourth QAI requirement).

---

[9] *See, e.g.*, *Garcia v. Sec'y of Health & Hum. Servs.*, No. 19-1529V, 2025 WL 1159016, at n. 15 (Fed. Cl. Spec. Mstr. Mar. 21, 2025), citing Cleveland Clinic, *SLAP Tear Surgery*, https://my.clevelandclinic.org/health/treatments/21844-slap-tear-surgery (explaining that SLAP stands for superior labrum anterior-posterior, and that SLAP tear surgery is often done to repair torn cartilage in the inner part of the shoulder joint). In *Garcia*, I emphasized that even the petitioner's expert Dr. Bodor acknowledged that SLAP tear was "unrelated" to the compensable SIRVA. *Garcia*, 2025 WL 1159016, at *8. *See also Fortney v. Sec'y of Health & Hum. Servs.*, No. 20-1471V, 2025 WL 835601, at *8 - 9 (Fed. Cl. Spec. Mstr. Jan. 29, 2025) (reflecting Respondent's objection, and my own doubt, that a SLAP tear was consistent with SIRVA); *Lawson v. Sec'y of Health & Hum. Servs.*, No. 18-0882V, 2021 WL 688560, at *6 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (similar); *but see Pruitt v. Sec'y of Health & Hum. Servs.*, No. 17-0757V, 2021 WL 5292022, at *9 (Fed. Cl. Spec. Mstr. Oct. 29, 2021) (in which Special Master Sanders concluded that the petitioner had preponderantly established that a SIRVA, overuse, and compensation "caused her subsequent SLAP tear").

Based on this argument's development to date, Petitioner faces some litigative risk regarding the fourth QAI requirement.[10] I will reserve final judgment on that point, and for now urge the parties to pursue settlement recognizing the case's limited scope[11] and the current factual findings in Petitioner's favor – as well as the risk facing the claim in a larger sense. If the parties cannot report a tentative settlement agreement within 60 days, the case will be transferred out of SPU for further proceedings.

**Accordingly within 60 days, by no later than Monday, July 7, 2025, Petitioner shall file a Joint Status Report updating on the case,** unless a 15-Week Order has been requested by that deadline.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[10] *See, e.g.*, *Durham v. Sec'y of Health & Hum. Servs.*, No. 17-1899V, 2023 WL 3196229 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) at *14 (explaining that 42 C.F.R. § 100.3(c)(10)(iv), "it is petitioner herself that bears the burden of showing that any evidence of [the alternative condition] is not meaningful"); *Rance v. Sec'y of Health & Hum. Servs.*, No. 18-0222V, 2023 WL 6532401, at *29 (Fed. Cl. Spec. Mstr. Sept. 11, 2023) (citing *Durham*); *French v. Sec'y of Health & Hum. Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023) ("[T]his Table element does not impose on Respondent the obligation to prove an alternative cause, but instead merely that the record contains sufficient evidence of a competing explanation to 'muddy' a finding that vaccine administration was the cause."); *French*, 2023 WL 7128178, at n. 8 ("this Table element expressly requires the *petitioner* to show no other 'condition or abnormality').

[11] As reflected herein, the treatment course for Petitioner's left shoulder injury was relatively conservative and concluded within eight months. Petitioner previously confirmed that the case does not involve ongoing medical treatment, a Medicaid lien, lost earnings, or worker's compensation. ECF No. 19.